May I please the court, counsel? My name is Janet Kibowitz and I represent the appellant Hilliard-Lyons in this matter. It is a regional brokerage firm based in Louisville, Kentucky. The underlying dispute involves allegations by Mrs. Ward, a former customer of Hilliard-Lyons, that Hilliard-Lyons improperly managed her brokerage account. Hilliard-Lyons filed this interlocutory appeal after the trial court denied Hilliard-Lyons' motion to compel arbitration. And as you may know, if you have a securities account with a brokerage firm, it's very common in the industry, the securities industry, for brokerage firms like Hilliard-Lyons to have arbitration provisions. And the arbitration provisions will require arbitration to be before FINRA, previously known as the NASD. And here, Hilliard's was no different, and if a potential customer at Hilliard-Lyons and at these other firms doesn't agree to arbitrate, Hilliard-Lyons won't do business with you because it is a condition of opening the account. Here it is undisputed that Mrs. Ward signed an investment account application with Hilliard-Lyons to open an IRA. And in that account application, she expressly acknowledged, with her signature, that she understood that arbitration would be required to resolve disputes at Hilliard-Lyons, that she had received a separate document called the Terms of Service, which in Sections 13 and 14 require mandatory arbitration. She also understood from the Terms of Service itself that Hilliard-Lyons would not open that IRA account on her behalf unless she, in fact, agreed to this mandatory arbitration. And Mrs. Ward manifested her assent when she opened her IRA and, in fact, maintained an account at Hilliard-Lyons for five months. Despite this clear manifestation of Mrs. Ward's agreement to arbitrate, the trial court held that there was no agreement to arbitrate between Mrs. Ward and Hilliard-Lyons under Kentucky law. And we would respectfully submit that the court erred for any number of reasons, each of which, standing alone, is sufficient to justify a reversal of the trial court's holding. First, the trial court erred when it held that Mrs. Ward had not assented or agreed to mandatory arbitration. Under Kentucky law, in this case it's governed by Kentucky law pursuant to the provisions, the choice of law provision in the agreements that Mrs. Ward signed. Under Kentucky law, assent to an arbitration agreement may be by signature or it may be by conduct. There is no requirement that an arbitration agreement be signed. And the account application which Mrs. Ward signed contained the following bolded statement right above her signature. Quote, by signing this application, I acknowledge that I understand and received a copy of the account terms of service, which in section 13 and 14 require arbitration to resolve disputes. Despite this expressed language, the trial court held the account application failed to show that Mrs. Ward had agreed to be bound by an arbitration agreement. And in reaching this conclusion, the court relied on two Supreme Court Kentucky cases. And I would submit that the court misapplied both the facts and the law of those cases to this case. The first was Dixon v. Damar. It was a Supreme Court decision in 2007. And I need to go briefly into the background to explain to the court why the court, the trial court here, misapplied the facts and the law. In Damar, the issue was whether a student enrollment agreement, which the students had signed on the front page, reflected any incorporation by reference or assent to arbitrate. The arbitration provision was on the reverse side of this document. But unlike in this case, the front page made no reference to any provisions on the reverse side, much less to an arbitration provision. Rather, the document only said on the front page that the students had read, quote, both pages and had gotten a copy. That's all it said. In addition, the student enrollment agreement was just one of at least 12 different documents that the students had signed at the same time. And the students claimed that they had never, that they had in fact been told not to even read the student enrollment agreement. The Supreme Court held that merely acknowledging receipt of a document standing alone is not sufficient under Kentucky law to constitute assent to be bound by an arbitration provision. Especially where here, there was absolutely nothing in the acknowledgment on the front page that would have made known that in fact there was any other provisions, such as an arbitration provision, to which they would be bound by. The second case is a case called Alleycat v. Chavann out of the Supreme Court. Alleycat had even more dissimilar facts. And suffice it to say that the holding that came out of the case was exactly the same here. And let me just say, in that case, there was a purchase agreement that was signed by an LLC. And the next day, an individual who was a member of that LLC got some limited warranties and acknowledged receiving those warranties. And in that document, there was also an arbitration provision. The individual wasn't, hadn't signed in a representative capacity. And on top of that, the court said that the person just acknowledged receiving the document. Here, unlike those two cases, the account application which Mrs. Ward signed specifically refers to the terms of service as requiring arbitration. It specifically refers to the paragraphs in the terms of service where the arbitration provisions appear. And Mrs. Ward acknowledges in writing that she understood the terms of service. So the language in the acknowledgment and the accompanying terms of service, which was a separate document, were clearly sufficient to have manifested or told Mrs. Ward that she would be required to arbitrate her disputes. And let me say this. There is absolutely no dispute that she signed the document, that she received the terms of service, that she signed the acknowledgment in her own hand. So those are undisputed facts in the record. A recent decision by the Kentucky Court of Appeals in Gatlin v. Firestone, which we cited to the court in our brief, further supports our position. It came out in 2015. And in that case, an employee agreed to be argued that she wasn't bound by an ADR plan, a separate document that her employer had published because she said she never got a copy of the plan. The employee had signed an acknowledgment whereby she acknowledged receiving the plan, that she had, and in that acknowledgment she also said, I had an opportunity to review the plan and that it provided for mediation and arbitration. In holding that that signed acknowledgment manifested an assent to arbitrate and their agreement to arbitrate, the court concluded that that language was sufficient to tell that employee that she would be required to submit to the employer's ADR plan. And I would suggest that this case requires the same result. In addition, Mrs. Ward's conduct manifested her agreement to arbitrate. The terms of service which she received, which she acknowledged that she understood, state at the very beginning of the document in bold font that Hilliard-Lyons, quote, agrees to open and maintain one or more investment accounts for you. And then it goes on to say, in exchange, you agree to the following terms of service. And then in paragraphs 13 and 14, it specifically speaks to, and we've given these documents to you at length and we've cited to them in the briefs, that there are mandatory arbitration provisions before FINRA and that she is subject to resolving all of her disputes with Hilliard-Lyons in that forum. So under Kentucky law, Mrs. Ward clearly manifested her assent to be bound by a mandatory arbitration agreement by signing the application, acknowledging that she received and understood the terms of service, which included the arbitration clause, and also by her conduct in opening an account with Hilliard-Lyons, knowing that Hilliard-Lyons would only open an account if she agreed to mandatory arbitration. Counsel, where is that in the record? She agreed to open an account and she knew that she was mandated to it? It's in the terms of service, Your Honor. In the terms of service, she specifically says, I understand the terms of service and in the terms of service, Your Honor, it says at the very first sentence, and it's not as if it's written in legalese, I agree to open and maintain one or more investment accounts for you in exchange. You, Mrs. Ward, agree to the following terms of service. And so, Your Honor, there was no dispute below that she didn't understand. There's no dispute. Nobody ever claimed there was some ambiguity in what these documents said. So we would submit, and let me also say, we submitted an affidavit below of a Michael Barnett, who was the financial advisor, and he specifically told her in a conversation recited in that affidavit that Hilliard-Lyons would not open an account for her unless she signed that account application and returned it to Hilliard-Lyons. And so she, in turn, did that. So I believe that the record is undisputed that she would have, it's what she acknowledged in writing, that she understood the terms of service. So we believe that the court's findings, Your Honor, are contrary to the law in Kentucky and were erroneous and should be reversed for that reason alone. Second, the trial court erred when it held that the terms of service as a stand-alone document violated Kentucky's statute of fraud, Section 371.010. The court held that the agreement could not be performed within one year. In reaching this conclusion, the court held, quote, that the clear intent of the parties to this purported agreement is a contemplation that the agreement for investment and brokerage services would not and could not be completed within one year. But that's not the law in Kentucky. Kentucky law makes clear that expectations of the parties as to the probabilities of whether a contract can be performed within a year or not within a year is not within the statute of frauds. Under Kentucky's statute of frauds, if a contract and the courts use this, if a contract may be performed within one year, the statute of frauds does not apply. That is what the Dixon v. Damark case held. And Dixon, that case also made clear that only if evidence shows that it's factually impossible to perform a contract within one year does the statute of frauds even come into play. So here the undisputed evidence is that the contract could be performed within one year and, in fact, was. Not only was the contract between Hilliard-Lyons and Mrs. Ward terminable at will, neither had to stay, she didn't have to keep an account there, and Hilliard-Lyons didn't have to keep her as a customer, but she also closed her account within five months. So clearly, it was not a situation where it was factually impossible to be performed. And under Kentucky law, a contract terminable at will and which may be performed within one year is not within the statute of frauds. So the terms of service, standing alone, did not violate the Kentucky statute of frauds as a matter of law. So the court erred on that ground as well. Third, the court held that in holding that Mrs. Ward's signature on the account application wasn't sufficient under Kentucky law to incorporate by reference the terms of service. The court seemingly suggested that there has to be precise terms, specific words in order to incorporate by reference. And Kentucky law has asked, there are no specific words that you have to use in order to incorporate by reference. You don't have to say in I incorporate or I assent or I agree to be bound. There are no cases that say you have to have that. What you have to have is you have to be able to show that the parties had knowledge of the incorporated terms and assented to them. That's what Damar also says. And here, Mrs. Ward signed that acknowledgement. It not only referenced the terms of service, it showed that she received the terms of service and she acknowledged that she understood the terms of service. She acknowledged that she understood in essence that arbitration would be required to resolve disputes. In fact, that was in the acknowledgement that arbitration would be required to resolve them. So the acknowledgement that she signed reflected she had knowledge of the incorporated terms and she agreed to them. And so for this independent reason, we also believe that the trial court erred in holding that the clear language in the account application was not sufficient under Kentucky law to incorporate by reference the terms of service. The court also, in its order, declined to reach the issue of whether the arbitration agreement was enforceable under the Federal Arbitration Act or whether it was enforceable under the Kentucky law as was posed by Mrs. Ward's counsel. The parties fully briefed and argued that issue below and if this court is inclined to reverse the trial court's decision as we are requesting, we would request that the court also hold that the arbitration agreement is enforceable under the Federal Arbitration laws and not under Kentucky's Arbitration Act. The Supreme Court of the United States in a case called Shearson American Express v. McMahon which we cite in our brief back in 1987 held that the contracts in the securities industry involve interstate commerce and are therefore subject to the FAA the Federal Arbitration Act. The Supreme Court also made clear in a subsequent case that Federal law preempts State law on issues of arbitrability. The Illinois and Kentucky courts in turn we've cited those cases follow that same principle under the mandate of the Supreme Court that the Federal Arbitration Act applies to arbitration provisions where the contract involves interstate commerce. Here the arbitration provisions in the terms of service expressly provided that the arbitration would be conducted before FINRA under FINRA's code. It did not say it would be done under Kentucky law. Because the contract involves interstate commerce the FAA preempts Kentucky State law on the issue of arbitrability and therefore this the court has subject matter jurisdiction to enforce the arbitration provision under the FAA. Finally, the talk were aired in not giving due regard to Federal and State policy which favors arbitration as required by the U.S. Supreme Court in Mastro Buono I hope I've got that right v. Shearson-Lehman which was decided in 1995. The Supreme Court made clear that ambiguities as to the scope of arbitration must be resolved in favor of arbitration. But instead of giving due regard to the policy favoring arbitration, the trial court below applied an incorrect principle of contract construction that has not been recognized based on our research by any U.S. Supreme Court or any Kentucky court in an arbitration context. The trial court said on page 4 of its opinion, quote, this court is mindful of the guidance of the United States Supreme Court that a court should strictly construe a contract against the interests of the party that drafted it and then decided to Mastro Buono v. Shearson-Lehman. But that's not what the U.S. Supreme Court said. What the Supreme Court said was, quote, respondents cannot overcome the common law rule of contract interpretation that a court should construe ambiguous language against the interests of the party that drafted it. The court went on to say because the respondents drafted the ambiguous document, they can't claim the benefit of the doubt for that. That's what the holding was in Mastro Buono, but here, as I've said before, there was no ambiguity in the document, and neither Hilliard Lyons nor Mrs. Ward ever believed that the language in the account application or the terms of service were ambiguous. Nor did Hilliard Lyons seek to benefit from any purported ambiguity as occurred in the Supreme Court decision. So we believe that the court's reliance on an incorrect rule of contract interpretation, which was not, in fact, recognized by the Mastro Buono court, and the court's failure to give due deference to both state and federal policy in favor of arbitration warrants reversal. Thank you. May it please the court, I must begin with the threshold issue that the court, I assume, is aware of. Prior to today's hearing, we filed a motion to strike pursuant to Rule 361. My motion raises two points. And by the way, the appellate court had previously issued an order that my motion be taken with the case. Could you introduce yourself for the record? I'm sorry. Yes. My name is Nate Brown, and I'm with the firm of Wildminster and Keck in Belva. My motion under 361 raises two points. One, appellants raise new theories on appeal that were not previously raised in the trial court. And number two, appellants take a ruling on an issue that was not addressed by the trial court's order which appellant has appealed. Specifically, my request of relief is the court should strike or disregard portions that present new theories and that would include the entirety of Point 1A and B of appellant's argument in brief, as well as any oral argument in support thereof, as well as the entirety of Point 2 as a matter that was not addressed by the trial court. Relief under 361 is appropriate. It is a dispositive motion challenging a portion of the appellant's argument. As noted by the committee comments to the rule, the purpose of a dispositive motion under 361 is to eliminate the burden of the parties by forcing them unnecessarily to brief and argue the merits of the appeal. This is especially true of an appeal under 307A, which includes an abbreviated briefing and oral argument scheduled. Furthermore, defendant's attempts to now raise these new theories on appeal undermines the adversarial system. It deprived the trial court of the opportunity to hear and consider the arguments that the justices just heard from counsel for appellants and it unfairly prejudices my client, who was deprived of the opportunity to create a factual record. We've heard numerous times this morning that there was no dispute. Well, there was no dispute, frankly, justices, because those points weren't raised in the trial court. And I'll address that in due course. I want to back up for a moment and give the justices an opportunity to hear some of the factual points that were not addressed by counsel's argument. The documents at issue in this case pertain to two agreements. One, an account application that begins on C23, that identifies itself on C24 as page 1 of 14. It's entitled Traditional Individual Retirement Account Application. If you continue on on that document to page 4 of 14 is where the signature line is. This is where the language that was cited by counsel for appellants appears. It states in relevant part, related to counsel for appellants, by signing this application I acknowledge that I understand and have received a copy of the account terms of service, which in order to resolve disputes. Also by signing this application I understand that investment products are not deposits or obligations of or guaranteed by Haley Alliance or any of its affiliates, nor are they insured by the FDIC. I also understand that investments are subject to risk, including the full or partial loss of my initial investment. I also acknowledge receipt of a copy of this account application. The Internal Revenue Service does not require your consent to any provision of the certification required to avoid backup withholding. Then, immediately above the signature line that my client signed, it states the undersigned hereby accepts the Hilliard Alliance Retirement Account Custodial Agreement. Beginning on page 5 of 14, the document is entitled Individual Retirement Custodial Account Agreement. That document continues until page 9 of 14 where it's entitled Disclosure Statement. And that document continues all the way through the end of page 14 of 14. Nowhere in those 14 pages is there an arbitration provision. I know that counsel for appellants made some reference to what's common in the industry. What's before this court and what was before the trial court was what was the agreement between this customer and this investment advisory firm. That's the question that the trial court dealt with. That's the question that's before you. And what we know is these documents were drafted exclusively under the control of Hilliard Alliance. They had the opportunity to draft them as they wished. They decided not to include an arbitration provision in the document that was signed. They decided not to appropriately under Kentucky law include incorporation or language manifesting an assent to be bound by the terms of service. The document that Hilliard Alliance now wants to point to as grounds for compelling arbitration is a terms of service document which begins on page C39 in the record. It identifies itself as a four page document. The portion of the document, the title says terms of service, the portion of the document that counsel for appellants read states in relevant part JJB Hilliard WL Alliance LLC agrees to open and maintain one or more investment accounts for you in exchange you agree to the following terms of service. It continues we wish that this could be shorter but many of these terms are prescribed by law you should read and agree to them in addition to the terms of service specific to the accounts you are opening. There is no signature on this document. There is no signature line on this document. That portion was provided by the argument provided by counsel for appellant. My motion number 361 advises this court that to the extent that appellants now have come into the appellate court and as we have just heard are now arguing as a stand alone document by her conduct in opening an account she has agreed to arbitration. That was not raised in the trial court. That was not raised in the trial court. And in fact I will say that appellants have conceded this point. On page 2 of their reply brief appellants state while WL did not precisely argue below that the terms of service was enforceable as a stand alone document it did address the terms of service as an integrated agreement with the account application and the IRA agreement. What they argued in the trial court is this. That they incorporated by reference the terms of service into the account application which my client signed. By virtue of that she agreed to the terms of service document which would include the arbitration provision. After the trial court looked at and considered the Kentucky Supreme Court case law which is abundantly clear on this issue Dixon relying on Alleycat both cases that appellants just referenced to you that says and I'll get to this in a moment but it says you have to have three ingredients to properly incorporate a document by reference and that's incorporation language, it's knowledge of the incorporated terms and it's express assent to be bound by those incorporated terms. It's that it's those three elements that the appellants failed to meet by virtue of how they drafted these documents. Had we had the opportunity in the trial court to address these issues at that time we could have put on a factual case regarding what Mrs. Ward understood whenever you look at these documents. She signed a document that said I'm agreeing to this 14 page document. She didn't sign a document that says I agree to be bound by the terms of service document. She looks at the terms of service document in a confusing language we were deprived of the opportunity to know that that was going to be placed at issue by appellants until the time that they filed this brief. They pivoted to new issues and Illinois Supreme Court case law is clear new issues raised for the first time on appeal should be disregarded as part of that appeal. The parties in this matter agreed that the necessary ingredients for incorporation based on Dixon which is the Kentucky Supreme Court case that came out in 2015 after the Gadliff case which is a lower court Kentucky court decision that there has to be clear incorporation language. That there has to be knowledge of the incorporated terms and there has to be assent to the incorporated terms. Assent has to be expressed in the Dixon case. What that hinged on is the language as drafted by the drafter in that case the college the language said I have read. It had no mention or reference to I have read and agree to this document the provisions of this document. That's the language that's missing in this case acknowledging receipt is insufficient in order to create an agreement between the parties that's the case in Allocat. In Allocat there was a contract regarding a warranty. The language there says I have read. That is insufficient to establish the third element of assent to be bound by the incorporated terms. I read specifically from Dixon. For a contract bound to incorporate the terms it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms. In addition there must be clear language expressing the incorporation of other terms and conditions. Again in Dixon the language at issue was I have read, received and read. The Kentucky Supreme Court continued in that case for the arbitration provision to be binding on the students and they must rely solely on the provision indicating that students have read both pages. This provision is played by the absence of any language indicating that the students actually assent to be bound or assent to the any indication that any terms are actually being incorporated. When you go back and you look at the language that Hilliard, Lyons and Appellants are citing to it merely states I acknowledge that I have received. I have read. Further on down that same document the document states I agree. I agree to the Hilliard, Lyons Appellants had the opportunity to draft this document in any way shape or form that they so desired. They chose to include the language that merely states I read the terms of service and they also decided to use the terminology I agree to the custodial account agreement. Which again this is devoid of any incorporating language identifying that the terms of service are being incorporated into the account application. It is devoid of any language which is required by the Kentucky Supreme Court of evidencing and again it must be expressed and it must be clear evidencing assent to be bound by that. We've now come into this court on appeals and defendants are taking the position before I move on from that one case that appellants raised in the trial court raised in their brief but didn't mention today was an Illinois case, the Bernardo case. I suspect that this wasn't raised today because it highlights the absence of this language. They talk about this being common in the industry. The fact of the matter  in the case of the Bernardo case there was an account application and you had account terms of service. In that case this is what the account application read. By signing below I acknowledge that I have received, read, understood and agreed to be bound by the terms and conditions as set forth in the customer agreement as currently in effect and as amended from time to time. By my signature on the account application I acknowledge that I have received, read, understood and agreed to the terms set forth in the foregoing agreement and that this agreement contains a pre-dispute arbitration clause at section 28 of page 3. Again as Bernardo case says which was cited by Appellants the account application incorporated the entire customer agreement by reference. The contract must show an intent to incorporate the other documents and make it part of the contract itself. Here the account application expressly refers to the customer agreement and notes that signing the account application manifests an intent to be bound by the That's the common industry practice. That's not what Hilliard-Lyons and Appellants did here and I submit to this Court that the facts of this case evidence significant departures in the way that this account was set up by Hilliard-Lyons so to the extent that they're not coming in and claiming that this is a part of a common industry practice the facts in this case don't bear that out. In fact Mrs. Ward was the only one who signed the account application which is a departure from Hilliard-Lyons standard practice. With regard to the Terms of Service document as a standalone document. The Terms of Service document falls within an exception to the statute of frauds. That was not addressed by Appellants in her argument. It's addressed though in Dixon as well as in Allocat. I read from Allocat. I may read from Allocat. When it is contemplated by the parties that the contract would not and could not be performed within the year, even though it was possible of performance within that time, the parties it comes within the inhibition of the statute. To the extent, and that is the issue in Dixon. The issue in Dixon was whether or not the students could sign up for the program and whether or not that came under the inhibition of the statute because performance could be performed within the year. It's a factual question at that point with regard to the well established, and again the Kentucky Supreme Court identifies that this is a well established exception to the statute of frauds. It is a factual question as to the intent of the parties. Once again this was not raised in the trial court. We were deprived of the opportunity to create a factual issue regarding this matter because once again the Appellants took the position until they pivoted on appeal that we were bound by an arbitration provision because it was incorporated by reference. We were dealing with one document, not two. That is a new issue on appeal. The clear intent of the parties in this case similar to Dixon, similar to Sawyer v. Mills which is cited in my brief, the clear intent of the parties was that this was going to be a long term agreement for investment advisory services. Both plaintiff and defendants acknowledged in the agreement that the plaintiff's time horizon was five to ten years and our primary objective was growth in income. This was not an agreement that was going to be resolved in a year. This was for a long term management investment of my client's assets. Counsel, you're arguing that issue was weighed by counsel. I am. The document itself is inconsistent. At one point it says you agree simply by opening the account. On the other hand, it says you have to read and agree to these. That's inconsistent. Thank you. Let me start off with we didn't raise new theories. We didn't raise new legal arguments. We did refute the legal theories and legal arguments made by opposing counsel before the trial court below. With respect to this argument about the, that somehow Hillyard Lyons didn't agree to raise the assent issue, that the argument that Hillyard Lyons didn't say to the trial court or to opposing counsel in its briefs what the terms of service actually said and that is that if you agree, if you want to open an account with Hillyard Lyons, if you want to do business with us, you've got to agree to these terms of service. That was briefed ad nauseum. It was briefed by Hillyard Lyons in their original briefing. It was argued during oral argument and it's in the sworn affidavit of Michael Barnett. I believe this is a red hearing to distract the court from what are very credible arguments as to why this decision by the trial court must be reversed. You know, this was all undisputed in the record. If Mrs. Ward wanted to come in and try to create a factual issue, she had every opportunity but she let all those facts lay undisputed. That's where a waiver argument now comes in because for the first time I'm hearing here's what we could have argued but they didn't argue it and they didn't dispute any of these facts. Bill and war courts don't require parties to limit their arguments to precisely the same arguments that they made below and here we clearly made arguments that Mrs. Ward had in fact manifested her assent by not only signing the acknowledgement on the application but also by accepting or opening and maintaining an account at Hillyard Lyons subject to those terms of service. Mr. Brown then next argued that the terms of service that we didn't argue that the terms of service was a stand-alone document for purposes of the statute of frauds. He's right. That was his argument. He came into court in the trial court below and he said if it's a stand-alone document, Your Honor, the statute of frauds applies. And we responded as we disclosed in our briefs that these are integrated documents in terms of they all make the complete agreement. So while we didn't specifically describe the terms of service as a stand-alone document, we did refute that the statute of frauds would apply to this situation. Mrs. Ward, it was the trial court that accepted the decision or the argument that was made by Mrs. Ward and said that the stand-alone that the terms of service as a stand-alone violated the statute of frauds. But in doing so, I mean, he relies so much on the Dixon case. The Dixon case is very clear that you don't have to have signatures on arbitration agreements. The Dixon case specifically says that if it may be performed within one year, then it's outside the statute of frauds. I disagree with my opposing counsel here that the court in Alleycat or in Dixon said you can ignore the language of the document and you can see what the parties intended, and that is the basis as to whether the statute of frauds applies or doesn't. If you read those cases, the courts are very clear. You've got to look at the documents, the four corners, and that is what was determinative and should have been determinative in this case since we had a terminable at-will agreement between Mrs. Ward and Hilliard-Lyons, and she didn't even maintain the account there for a year. This isn't a game of gotcha where a party can't raise on appeal that the court got it wrong, and we're not these are all legal arguments. There weren't any factual disputes, and so all of this was really fully vetted before the trial court, but the trial court latched on to language out of certain cases and said, well, this is the same thing that happened in your case. Thank you. Thank you, counsel, for your arguments. The court will take this matter under advisement and render a decision in due course.